SKC

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bruce J. Dent, Jr., | No. CV 20-00201-PHX-MTL (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| Corizon Incorporated, et al., | |
| Defendants. | |

Plaintiff Bruce J. Dent, Jr., who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman in Florence, Arizona, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983. Defendant Assistant Facility Health Administrator (AFHA) Michael Delgado moves for summary judgment. (Doc. 49.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 51), and he opposes the Motion. (Doc. 57.) The Court will grant the Motion for Summary Judgment.

**I.   Background**

In his First Amended Complaint, Plaintiff alleged that Defendant Delgado was aware of Plaintiff's chronic hand injury via Plaintiff's health needs requests (HNRs), Informal Complaints, Inmate Grievances, and via Delgado's personal review of Plaintiff's medical records, but Delgado made no effort to rectify the injury. (Doc. 12 at 4−7.) On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment deliberate indifference claim in Count One against Defendant Delgado and

directed Delgado to answer this claim.  (Doc. 13.)  The Court dismissed the remaining claims and Defendants.

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

. . . .

### III.   Facts[1]

On February 14, 2018, an Incident Command System (ICS) was called for a report that Plaintiff had injured his hand. (Doc. 50 (Def.'s Statement of Facts) ¶ 1.) According to Plaintiff's medical records, Plaintiff was working in the kitchen when he jumped and hit his hand on a warmer. (Doc. 50 at 11; Doc. 56 at 148.)[2] He was seen by Registered Nurse (RN) Cynthia Marquez, reporting 10/10 pain. (Doc. 50 at 11.) Dr. Stewart evaluated the injury and ordered wrist x-rays and prescribed Ketorolac 30mg every evening for 5 days. (*Id.* at 12.) Plaintiff's x-ray results were normal, showing no evidence of "fracture, dislocation, or lytic or blastic lesions. All the digits, interspaces as well as the carpals, normal right hand." (*Id.* at 23.)

---

[1] Plaintiff failed to comply with the Court's *Rand* Order and Local Rule of Civil Procedure 56.1(b), requiring that he file a separate statement of facts with numbered paragraphs corresponding to the numbered paragraphs in Defendants' Statement of Facts, stating whether he disputes those facts and citing to the specific, admissible portion of the record that supports his version of the facts. (*See* Doc. 51 at 2−3 (quoting LRCiv 56.1(b)).) Instead, he filed a combined "Response and Statement of Facts to Defendant's Motion for Summary Judgment" (Doc. 56), which contains only unnumbered, non-chronological paragraphs regarding his medical issues without reference to Defendants' facts. (Doc. 56.) He also filed "Plaintiff's Additional Supporting Facts in Response to Defendant's Motion for Summary Judgment" (Doc. 57), with paragraphs pertaining to Defendant's exhibits supplemented by facts from Plaintiff's own exhibits, often from different time frames and medical records that are also covered in Defendant's facts. (Doc. 111.) Plaintiff's failure to respond clearly to Defendant's facts makes it difficult for the Court to determine which, if any, of Defendant's facts are subject to genuine dispute.

The court is mindful of the Ninth Circuit's overarching caution in this context that district courts are to "construe liberally motion papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir.2010). Thus, where it can readily identify which of Defendant's facts are in dispute, the Court will look to any clearly cited evidence or relevant first-hand allegations in Plaintiff's verified First Amended Complaint to determine if the dispute is genuine. Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). The Court will otherwise consider Defendant's supported facts undisputed.

[2] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

On February 20, 2018, Plaintiff was seen by Nurse Practitioner (NP) Burns for follow up on his hand. (Doc. 50 ¶ 3.) He reported continued pain, mostly between his right index and middle finger, and lack of flexion/extension. (*Id.*) Burns reviewed Plaintiff's x-rays and confirmed they were normal. (*Id.*) Plaintiff reported many past broken fingers and toes that had healed, and he reported that he was not currently working but requested light duty so that he would not lose his job. (*Id.*) Upon exam, Burns noted

> R. 3rd digit sits flexed at 45 degrees and with attempted full extension (unable to extend finger at MCP beyond zero degrees) pain at dorsal portion of metacarpal bones between 3rd & 2nd & 4th digits; visible edema to R 3rd MCP and very tender to palp at MCP and slight tenderness to PIP [with] only about 30 degrees total ROM [range of motion] to R 3d digit and unable to flex MCP > 45 degrees d/t pain at MCP joint.

(Doc. 50 at 28.) Burns assessed right hand "flexor tendon injury, partial tear vs laceration, sprain" and issued a special needs order (SNO) for no lifting, pushing, pulling, or running. (*Id.* at 30−31.) The plan was for an urgent hand CT, elevate hand as much as possible, ibuprofen as needed, and follow up in 4−5 weeks. (*Id.* at 31.) The same day, Burns requested an urgent radiology consult. (*Id.* at 33−35.)

On February 21, 2018, NP Burns' consult request was forwarded to the Utilization Management (UM) Team for review, and on February 22, 2018, the UM Team denied the request and opted for an alternative treatment plan (ATP), noting "[h]yperextension injuries of the MCP can typically be treat[ed] by immobilizing in 30 degrees of flexion for 2 to 3 weeks." (*Id.* at 34, 36.)

On February 27, 2018, Plaintiff saw NP Burns for follow up, and he reported decreased swelling and pain but that he still lacked full range of motion to his right third digit. (Doc. 50 ¶ 5.) Upon evaluation, Burns assessed decrease in functional status with deficits that can be addressed by physical therapy. (*Id.*) She discussed the ATP, which was for Plaintiff to remain in an orthoglass splint and keep his hand immobilized, and she submitted a routine consultation request for physical therapy 2 times a week for 6 weeks.

(Doc. 50 at 52.) Follow up was to occur in March to determine the plan of care and if the CT should be re-requested. (Doc. 50 ¶ 5.)

On March 13, 2018, Plaintiff was seen by NP Deringer, and he reported continued pain and decreased range of motion but was not taking his ibuprofen as directed. (*Id.* ¶ 6.) Upon examination, his right hand showed some swelling of the 2nd and 3rd proximal finger joints and decreased range of motion and strength. (*Id.*) Deringer ordered a new x-ray, provided hand/finger exercises, and emphasized to Plaintiff not to immobilize his hand and fingers at this point. (*Id.*) Derenger placed a routine priority consult request for Plaintiff to be evaluated by occupational therapy. (*Id.*) On March 14, 2018, Plaintiff had repeat x-rays, which were normal. (*Id.*)

On March 27, 2018, Plaintiff submitted an Inmate Informal Complaint Resolution, complaining about his ongoing hand issues, including that, on February 20, 2018, NP Burns requested a CT scan and placed him on 2−3 weeks of right-hand immobilization and light duty, but the CT scan was denied for another 2−3 weeks of immobilization. (Doc. 56 at 27.) Plaintiff stated that he had filed multiple HNRs for an MRI/CT scan and to see a hand specialist and claimed he needs reconstructive surgery because he is unable to fully extend his fingers, close and grip with his right hand, and is still in pain. (*Id.*) As a resolution, he requested "a 2nd and 3rd opinion from outside hand-specialists." (*Id.*)

On April 13, 2018, Plaintiff was seen at Industrial Hand Physical Therapy (IHPT) for evaluation. (Doc. 50 at 56.) Upon observation, Plaintiff was unable to fully straighten the fingers of his right hand and had limited motion at the wrist due to pain. (*Id.* at 57.) The therapist noted that "<u>MRI might be beneficial to rule out any tendon or ligament injuries that may require surgical intervention</u>." (*Id.* (emphasis in original).) At this visit, Plaintiff alleges he was "forced to endure excruciating pain," while gripping and twisting a rubber net, grinding rice in a bowl, and other exercises to stretch and force his fingers open, and the therapist advised him the pain was due to his long period of inactivity. (Doc. 12 at 7.) Plaintiff advised the therapist of a "snap" in his hand during one of the exercises. (*Id.*) The therapist recommended physical therapy 2 times a week for 6 weeks

to improve muscle strength, ROM, flexibility, and muscle function and again wrote that Plaintiff "may benefit from follow up with a hand surgeon and a MRI to rule out any tendon or ligament issues that may require surgical intervention." (Doc. 50 at 58.) Plaintiff was given a home exercise plan. (*Id.* at 60−61.)

On April 19, 2018, Plaintiff submitted an HNR, asking whether the PT doctor requested reconstructive surgery and wanting to know why he had to have physical therapy "when I'm just gonna [sic] have to get surgery anyways." (*Id.* at 63.)

On April 23, 2018, Plaintiff received a response to his March 27, 2018 Informal Complaint from the Assistant Director of Nursing (ADON) RN J. Todd, stating that "[t]he medical provider requested an outside consult during your last visit.  This appointment was approved and has been scheduled." (Doc. 56 at 28.)[3]

On April 24, 2018, Plaintiff was seen by NP Igwe, who noted Plaintiff had gone to physical therapy and that home exercises were recommended. (Doc. 50 ¶ 10.) Upon examination, Plaintiff had equal bilateral grip strength; used his hands effectively with no limitations or discomfort; was able to use his right hand to open his bag, pull out a CD, and open the CD cover; had good fine and gross motor movements; and had a protruding MCP with limited extension at the MCP joint, but otherwise no edema, erythema, open wound, or bruising. (*Id.*) Plaintiff was not taking his pain medications as prescribed. (*Id.*) Igwe prescribed Tylenol, and the plan was for Plaintiff to continue home exercises rather than offsite physical therapy, and Plaintiff was agreeable to this plan. (*Id.*)

On April 25, 2018, Plaintiff submitted a new Inmate Informal Complaint Resolution, requesting to see "an <u>actual</u> hand specialist," and stating that he was now required, per NP Igwe, to do PT for 16 weeks before a specialist would be recommended. (Doc. 56 at 32 (emphasis in original).) He questioned why he was sent to a physical therapist, not to a hand specialist, as stated in ADON Todd's previous response, and he

---

[3] It is not clear to which outside consult this Response refers. The Response is dated March 27, 2018, at which time Plaintiff had been scheduled for outside physical therapy, but Plaintiff claims he did not receive the Response until April 23, 2018. (Doc. 56 at 28.)

requested to see a certified hand specialist so he could get on with desperately needed reconstructive surgery. (*Id.*)

On May 4, 2018, Plaintiff was assessed by Nurse Starling, and he again requested surgical intervention. (*Id.* ¶ 10.) He reported that his PT exercises were painful, but he had no pain at rest. (*Id.*) Upon examination, Plaintiff was able to carry paperwork in both hands and unwrap and flex his right hand and extend his fingers—though not fully—with no wincing or guarding. (*Id.*) Plaintiff was advised to take his pain medications and that chronic pain post injury is not uncommon. (*Id.*)

On May 11, 2018, Plaintiff was assessed by Dr. Penn for continued pain in right hand and pain with PT exercises. (*Id.* ¶ 12.) Dr. Penn discussed with Plaintiff that he needed to complete six weeks of PT with follow up afterwards to re-evaluate whether he needed to see a hand surgeon. (*Id.*) He was to take ibuprofen as needed and continue with a splint. (*Id.*)[4]

On May 17, 2018, Plaintiff submitted an Inmate Grievance, complaining that he had yet to be sent out for an MRI or CT or seen by a certified hand specialist. (Doc. 56 at 33.) He stated that he had let the provider at the prison and the PT doctor know that PT was causing pain and "further complications," he was concerned that PT might lead to permanent damage, that he could not physically do PT, and he needed reconstructive surgery. (*Id.*)

On June 7, 2018, Plaintiff was again assessed by Dr. Penn after completing more than six weeks of home exercise, and he reported no improvement. (*Id.* ¶ 13.) Plaintiff's grip strength was 4+/5 on right, and his hand was tender to palpation, with lack of full extension of his right-hand digits. (*Id.*) Dr. Penn instructed Plaintiff to continue home exercises and issued a consult request for Plaintiff to see a hand surgeon based on Plaintiff's report of doing home exercises for more than 6 weeks without improvement. (*Id.*, Doc. 50 at 91.)

---

[4] It is unclear from the facts presented when Plaintiff was given a splint, and this instruction appears to conflict with NP Derenger's March 13, 2018 instruction that Plaintiff should no longer immobilize his hand.

On June 8, 2018, Plaintiff submitted an Inmate Grievance Appeal, stating he had yet to receive a response to his May 17, 2018 Inmate Grievance regarding his need to see a certified hand specialist, and he was physically, mentally, and spiritually distraught and in pain every day. (Doc. 56 at 34.) He again requested to be scheduled to see a certified hand specialist so that he could get surgery. (*Id.*)

On June 12, 2018, the UM Team reviewed and approved Dr. Penn's consult request for Plaintiff to see a hand specialist. (*Id.*)

On June 21, 2018, Plaintiff refused to be seen by nursing for an assessment of his right hand, stating that he was waiting for an offsite consultant's opinion. (Doc. 50 at 5.)

On July 3, 2018, Plaintiff filed an HNR, asking when he would have an MRI and see a hand specialist. (Doc. 50 ¶ 15.) That same day, RN J. Jones hand wrote on the HNR, "Your consult was approved and is in 'scheduling.'" (Doc. 50 at 102.) On July 12, 2018, Plaintiff's outside consult was scheduled. (*Id.* at 92.)

On July 13, 2018, Defendant Delgado responded to Plaintiff's May 17, 2018 Inmate Grievance in which Plaintiff had requested an MRI and an outside consult with a hand specialist. (Doc. 50 at 105.) Delgado stated that investigation into Plaintiff's medical records showed that Plaintiff had been seen by physical therapy on April 13, 2018, and the documentation in his chart showed he was to continue therapy onsite, which was not demonstrated. (*Id.*) Plaintiff was instructed to submit an HNR if he still lacked full range of motion. (*Id.*) Delgado concluded, "Your grievance is Not Substantiated and Resolved. In accordance with current policy, this response is final, and constitutes exhaustion of all remedies within the Department. (*Id.*) Plaintiff received Delgado's Response on July 17, 2018. (Doc. 56 at 35.)

As an AFHA, Defendant Delgado was solely acting as an administrator, not as a medical provider, and part of his duties were to respond to prisoner grievances. (Doc. 50 ¶ 23.) AFHAs do not have authority to make clinical decisions or override the decisions of unit providers, and they have no authority to requests offsite consults, diagnostic tests, or medication. (*Id.*) Delgado claims he reviewed all of Plaintiff's medical records at the

time of his Response and that the records showed that Dr. Penn had requested a surgical consult on June 7, 2018, and on July 3, 2018, it was communicated to Plaintiff that his consult was approved and in scheduling. (Doc. 50, Ex. V (Delgado Decl.) ¶ 9.)

On July 26, 2018, Plaintiff was taken to the Arizona Center for Hand to Shoulder Surgery and seen by Dr. Lloyd P. Champagne, MD. On physical examination, Dr. Champagne noted that Plaintiff's hand "looks normal," but Plaintiff "is lacking 20 degrees of MCP extension at index, middle, ring, and little [fingers and lacking] 10 degrees of full flexion," with tenderness at the MCPs. (Doc. 50 at 107.) Dr. Champagne requested an MRI and follow up. (*Id.*)

About 3 months later, on October 15, 2018, Plaintiff was taken to AZ-Tech Radiology for an MRI. (*Id.* at 109.) The MRI showed the following results:

> 1. Longitudinal split radial collateral ligament third MCP which may be from chronic injury. Small third MCP joint effusion.
>
> 2. Radial and ulnar collateral ligament thickening second and fourth MCPs without definite tear. Chronic sprain suggested.
>
> 3. Slight volar subluxation of the second proximal phalanx relative to metacarpal. No dislocations are seen.

(*Id.* at 110.)

On November 6, 2018, Plaintiff was again seen by Dr. Champagne for follow up on the MRI, and Dr. Champagne assessed "[p]robable metacarpophalangeal joint subluxation and/or dislocation or stress with capsular ligament injuries going back about 9 months. In general, he has functional hand, but it is tender." (*Id.* at 113.) Dr. Champagne did not recommend surgical correction but instead gave Plaintiff a steroid injection, which Plaintiff tolerated well, with a plan to reevaluate in about 2 months with new films. (*Id.* at 113−14.)

Four months later, on March 22, 2019, Plaintiff was seen at the Arizona Center for Hand to Shoulder Surgery by Steven V. Harrison, P.A., and he reported that the steroid injection only took the swelling away, but he still had persistent pain. (*Id.* at 120.) PA

1  Harrison spoke extensively to Plaintiff about his options, and Plaintiff was scheduled for
2  exploratory surgery. (*Id.* at 121.)
3        On April 15, 2019, Plaintiff underwent exploratory hand surgery. (Doc. 50 ¶ 20.)
4  On April 23, 2091, he was seen for follow up, and Dr. Champagne found that he had
5  "suspected saddle syndrome, but his intraoperative findings were not remarkable."
6  (Doc. 50 at 127.) Upon exam, Plaintiff had tenderness at the MCP joint, and his hand was
7  very stiff. (*Id.*) His digits were all well perfused, and his wounds were healing without
8  infection. (*Id.*) His hand was assessed as doing well but stiff. (*Id.*) The plan was
9  aggressive mobilization of the hand with therapy orders given and follow up in one month.
10 (*Id.*)

11 **IV.  Discussion**

12     **A.  Eighth Amendment Standard**

13       To prevail on an Eighth Amendment medical care claim, a prisoner must
14 demonstrate that a defendant acted with "deliberate indifference to serious medical needs."
15 *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97,
16 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective
17 prong and a subjective prong. First, as to the objective prong, a prisoner must show a
18 "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical
19 need exists if the failure to treat a prisoner's condition could result in further significant
20 injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d
21 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*,
22 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples
23 indicating a serious medical need include "[t]he existence of an injury that a reasonable
24 doctor or patient would find important and worthy of comment or treatment; the presence
25 of a medical condition that significantly affects an individual's daily activities; or the
26 existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.
27       Second, as to the subjective prong, a prisoner must show that the defendant's
28 response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts

with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**B.   Analysis**

Defendant Delgado does not dispute, and there can be no reasonable doubt that Plaintiff's hand injury, resulting in persistent pain, loss of mobility and strength, and requiring x-rays, pain relief medication, light duty, immobilization, physical therapy, regular follow up visits, outside specialist evaluations, a steroid shot, and exploratory

surgery over a 9-month period, constituted a serious medical need. Summary judgment therefore hinges on the second prong—whether Delgado knew of and was deliberately indifferent to this serious medical need.

There is no genuine factual dispute that Defendant Delgado reviewed Plaintiff's medical records up to the time he responded to Plaintiff's Inmate Grievance on July 13, 2018; Delgado was therefore aware of facts from which a reasonable jury could conclude that he knew Plaintiff had a serious medical need. The remaining question is whether Delgado's Response was deliberately indifferent to that need.

Defendant Delgado argues that his Response to Plaintiff's Inmate Grievance, in which he reflected that Plaintiff was to continue PT onsite, was appropriate. (Doc. 50, Ex. V (Delgado Decl.) ¶ 9.) Delgado bases this argument on Plaintiff's medical records showing that Dr. Penn instructed Plaintiff to continue home exercises while awaiting a specialist consult. (*Id.*) While correct, Delgado's Response erroneously stated that Plaintiff's medical records showed he had failed to complete his PT, when the records showed that Plaintiff had already continued his home exercise plan under Dr. Penn's recommendations for more than 6 weeks without improvement, leading Dr. Penn to request an outside consult. Delgado's Response also ignored that Plaintiff complained of increased pain and "further complications" due to physical therapy and feared he could potentially be doing permanent damage to his hand. (Doc. 56 at 33.) Additionally, Plaintiff specifically requested a consult with a certified hand specialist, and although Plaintiff's medical records showed that this consult had by then been scheduled, Delgado made no mention of the consult being scheduled when he determined that Plaintiff's Inmate Grievance was unsubstantiated and resolved. (*See* Doc. 50 at 92.)

Despite being misleading and not directly responsive to Plaintiff's complaints and requests, however, this one-time Grievance Response concerning Plaintiff's hand while Plaintiff was otherwise receiving regular medical care from his direct medical providers is not enough to show Delgado was deliberately indifferent to Plaintiff's serious medical needs. The evidence demonstrates, at most, that Delgado was negligent in his review of

Plaintiff's medical records. But it does not evince that Delgado repeatedly knew of and deliberately failed to address Plaintiff's serious medical needs or that the carelessness demonstrated in his Response was egregious enough to constitute deliberate indifference. *See McGuckin*, 974 F.2d at 1060−61 (repeated failure to properly treat a prisoner's serious medical needs or a single failure that is egregious suggests deliberate indifference). The record also does not support that any failure on Delgado's part to properly respond to Plaintiff's Grievance adversely impacted Plaintiff's medical care or caused Plaintiff harm, particularly where the evidence shows that Plaintiff was subsequently provided the specialty consult and MRI he requested, and his consult with Dr. Champagne had already been scheduled independently of Delgado's Grievance Response.

On this record, Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Delgado fails as a matter of law, and the Court will grant the Motion for Summary Judgment and dismiss Delgado and this claim with prejudice.

**IT IS ORDERED:**

(1)   The reference to the Magistrate Judge is **withdrawn** as to Defendant Delgado's Motion for Summary Judgment (Doc. 49).

(2)   The Motion for Summary Judgment (Doc. 49) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 7th day of December, 2021.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge